IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                                      **CR No. 01-1195 LH**

**SAMMY JOSEPH, aka, ASIM YOUSEF,**

    **Defendant.**

**MEMORANDUM OPINION AND ORDER**

    **THIS MATTER** comes before the Court on Defendant's Motion to Suppress Evidence and Statements (Docket No. 19). The Court, having considered the briefs and arguments of the parties and relevant caselaw, as well as evidence presented at the hearing conducted on January 2 and 4, 2002[1], concludes that this motion is well taken and shall be **granted**.

**Discussion**

    Defendant was an Amtrak passenger on August 20, 2001, traveling from Albany, New York, to Los Angeles. He had purchased a one-way cash coach ticket in the amount of $306.00. The ticket was apparently purchased approximately one hour before train departure. The call-back

---

[1]During the two day hearing, Defendant was assisted at all times by an Arabic interpreter.

1

number listed on the reservation revealed a voice mail response. Defendant upgraded to a roomette and paid $117.00 in cash, at some point between Chicago and Albuquerque. Wearing only an undershirt and underwear, Defendant was awakened by the knock on his door of Agent Salazar. Agent Salazar identified himself as a policeman and recorded the subsequent nearly nine minute conversation with Defendant on a belt tape recorder. At the end of this conversation, Defendant was handcuffed and arrested.

Defendant moves to suppress all evidence seized by the Government on August 20, 2001. It is his position that the drugs seized and statements made by Defendant were the fruit of an initial illegal detention and that these items must be suppressed.

**Nature of the Questioning**

Defendant states on the first page of his brief that the "ultimate issue is whether the encounter which occurred between Defendant Joseph and the law enforcement agents on an Amtrak train was a consensual encounter or an investigative detention."

A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). Whether an encounter can be deemed consensual depends on "whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *United States v. Little,* 18 F.3d 1499, 1503 (10th Cir. 1994). An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave. *See United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). Therefore, an unlawful detention occurs only when the defendant has an "objective

reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *Hernandez*, 93 F.3d at 1498. "The test is objective and fact specific, examining what the police conduct would have communicated to a reasonable person based on all the circumstances surrounding the encounter." *Little*, 18 F.3d at 1503.

The Tenth Circuit has considered various factors as being relevant in its totality of the circumstances analysis, with a focus on the "coercive effect of police conduct, taken as a whole." *Id.* at 1504.[2] I note that only in rare instances is any one factor determinative. *Id*. at 1503. I will discuss the relevant factors I discerned from the evidence presented to me.

*1. Location.* First of all, I note that although passengers may have a "higher" expectation of privacy in a train roomette, any such expectation "has only a limited relevance to the question of whether a police-citizen encounter in such a roomette is consensual." *Id*. at 1505.

Whether Defendant is in an open public place where he is within the view of persons other than law enforcement officers is relevant. Here, Defendant was in his roomette during most of the conversation. According to his testimony, the roomette was "very small". Defendant testified that most of the time he was in the roomette and that Agent Salazar was blocking the roomette entrance, that he was half inside and half outside the roomette. Agent Salazar testified however that at no time did he block Defendant in the room. At one point, Defendant went out into the hallway to point out his suitcase on a luggage rack; otherwise he was inside the roomette. As testified to by Agent

---

[2] *United States v. Hill*, 199 F.3d 1143, 1147-1148 (10th Cir. 1999) indicated that factors relevant to whether a reasonable person would feel free to terminate an encounter with police include "the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public."

3

Salazar, the hallway was quite narrow and was generally considered a public area. A review of the audiotape indicates that during the questioning, one girl passed by the roomette. Defendant testified that he was not aware of any people going by his roomette. He did testify however that when the train was about to move, presumably at the end of the conversation, some people were someplace near the roomette and Agent Salazar asked them to wait. Agent Salazar's testimony is consistent basically, in that he testified that there were not very many people around until later on in the conversation. Based on these facts, I conclude that the questioning occurred primarily in a confined space and outside of public view, and was primarily private in nature.

  *2. Number, clothing, demeanor, weapons, tone of voice, and conduct of agents; other potentially threatening or intimidating factors.* Once Defendant opened the door to his roomette and got out of bed, he saw another man outside the roomette door, whom he assumed was with Agent Salazar.[3] This second man remained present for the remainder of the questioning. At all times, including when he was in the hallway, Defendant was physically contained between the two agents. The two agents were in plain clothes. Agent Salazar asked the vast majority of the questions; Agent Perry was engaged only to a limited extent in the questions and answers with Defendant. His tone of voice was non-threatening. However he asked an exceptional number of questions, in an excessively speedy, persistent and hard-to-comprehend manner. There were perhaps as many as 65 run-on questions asked of Defendant in approximately nine minutes. Neither agent displayed any weapons, until the point when Agent Salazar cut open a taped box in Defendant's backpack with a knife. Neither officer touched nor physically restrained Defendant until such time as he was handcuffed. Agent Salazar returned Defendant's identification to him right after he examined it.

---

  [3] This was Agent Perry.

*3. Advisement of rights.* Agent Salazar did not advise Defendant, during this conversation, of his right to refuse to answer the agent's questions or that he had the right to leave the encounter. While there is no *per se* requirement of such an advisement, *Little*, 18 F.3d at 1505, it is a factor for this Court to consider in its totality analysis.

*4. Other factor.* Defendant was in his undershirt and underwear for a considerable portion of the encounter. I believe this fact bears on the issue of whether or not Defendant felt confined to the roomette and unable to leave.

Based on the totality of the circumstances, without giving determinative weight to any one factor, I conclude that Defendant could reasonably believe that he was not free to ignore Agent Salazar's questions and requests and go about his business. From the time that the questioning began, Defendant's liberty was restrained. At no point prior to the search was there sufficient reasonable suspicion to detain Defendant[4], and his detention thus violated the Fourth Amendment.

In reaching this conclusion, I have relied on all the facts set forth in the record and on my determinations as to credibility of the witnesses.

I will summarize the factors that I consider most relevant to this analysis: First of all, as stated above, I conclude that the questioning occurred primarily in a romette, in a confined space, outside of public view, and that it was primarily private in nature.

Next, I have looked to several factors directly derived from the conduct of the agents. I conclude that the facts that there was more than one agent and that Defendant was kept at all times

---

[4] The Government does not claim that it had reasonable suspicion. Agent Salazar testified that on the one hand he had some points that could have led him to reasonable suspicion of illegal activity. On the other hand he also testified that Defendant could have left at any time during the encounter, and that Defendant was not being detained.

5

between the physical presence of both agents could have communicated that he was not free to leave. The nature and manner of the questioning were excessively speedy, persistent and hard-to-comprehend. Agent Salazar asked for consent to search a total of ten times, a number that is clearly excessive and coercive. Agent Salazar failed to advise Defendant that he had the right to refuse to answer questions or to otherwise terminate the encounter. I believe this police conduct would have conveyed to a reasonable person that he was not free to decline the officer's requests or to otherwise terminate the encounter.

Finally, I have relied on the fact that Defendant was in his underwear and undershirt for a considerable portion of the questioning. I believe that this fact is a circumstance that would make any reasonable person feel more vulnerable to authority and to feel that he or she could not leave the privacy of the roomette, at least prior to the time that full dress was acquired. This factor weighs in on the side of the coercive nature of the questioning.

Taken in their totality, I conclude that these circumstances indicate coercive effect of police conduct, taken as a whole, sufficient to convey to a reasonable person that he or she was not free to decline the agents requests of otherwise terminate the encounter.[5] I conclude that this was *not* a

---

[5] Particular personal traits or the subjective state of mind of Defendant are relevant to this applicable objective "reasonable person test" only to the extent that they may have been known to the officer and influenced his conduct. *United States v. Bloom*, 975 F.2d 1447, 1455 n.9 (10th Cir. 1992), *overruled in part on other grounds by United States v. Little*, 18 F.3d 1499(10th Cir. 1994). Unless there is evidence that Salazar knew of any particular personal traits of Defendant and that these traits influenced Salazar's conduct, such traits are irrelevant to the question as to whether or not the encounter was consensual.
    In this particular analysis, I have not relied on any personal traits of Defendant or on his state of mind. Although he testified to a personal trait, *i.e,* his great fear of police, there is no evidence or inference that this was known to the agents or might have influenced their conduct, despite their observance of Defendant's visible nervousness and shakiness.
    Similarly, although reference was made to Defendant's being from Africa and having an accent, Agent Salazar stated during the questioning that Defendant spoke English well. Although perhaps obvious to the agents, there is simply no evidence or even any inference that the fact that Defendant was from a foreign country and may have spoken English as a foreign language influenced their conduct in any way.

consensual encounter, but rather, an illegal detention.

**Consent to Search**

The Government contends that Defendant voluntarily consented to the search. The evidence as to what consent was given is as follows. Agent Salazar testified about the various times that he asked Defendant for permission to search the room and the luggage. He testified that ten different times he asked for and received verbal approval from Defendant to search his room and/or luggage. The Court has carefully reviewed the contents of the audiotape. It is remarkable that nine of the ten instances of consent testified to by Agent Salazar are garbled and inaudible on the tape. Only the tenth instance is audible. It does not ring true that Agent Salazar received consent from Defendant ten times. The tenth time that Agent Salazar asked for consent, he asked for permission to open the backpack. Defendant stated "I don't have no problem." When Agent Salazar asked him again, "It will be okay?", Defendant replied "Yeah." Later on when Agent Salazar indicated that he was going to cut the tape around a box found in the backpack with a knife, Defendant stated, "Go ahead." Later, Agent Salazar testified that Defendant never withdrew his consent to look into the backpacks or shoe boxes. He stated his opinion that Defendant understood the questions that Agent Salazar asked him.

"Valid consent is that which is 'freely and voluntarily given.' " *United Sates v. Pena*, 143 F.3d. 1363, 1366 (10th Cir. 1998) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). Whether a defendant freely and voluntarily gave consent to a search by a police officer is a question of fact to be determined from the totality of the circumstances. *Patten*, 183 F.3d at 1194 (*citing Ohio v. Robinette,* 519 U.S. 33, 40 (1996). The Government bears the burden to show that the consent

was voluntary. *Id.* The test is not purely objective, *i.e.*, whether a reasonable person would have felt coerced, but rather, whether the consenting party felt coerced under the existing circumstances. *See United States v. Mendoza-Salgado*, 964 F.2d 993, 1011 n.9 (10th Cir. 1992).

To determine voluntariness, the Court must consider whether the consent was "unequivocal and specific and freely and intelligently given," and whether it was given without implied or express duress or coercion. *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997)(*quoting United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

In determining whether consent was voluntarily given, courts look to various factors including: (1) the suspect's knowledge of the right to refuse consent; (2) the suspect's age, intelligence, education; and, (3) the length of detention and the nature of the questioning. *Schneckloth*, 412 U.S. at 227.

Insofar as these factors are concerned, I again note that Agent Salazar did not inform Defendant of his right to refuse consent, and that Defendant indicated that he was unaware of his rights in this regard. Agent Salazar testified that he provided Defendant no idea of what his rights were until they were at the DEA office.

The Defendant was 31 years of age at the time of this questioning, of average intelligence. There is no specific evidence as to his education, except that he has never studied English in school – a factor that will be discussed below.

The detention was approximately nine minutes in length. I have already concluded that the nature of the questioning was excessively speedy, persistent and hard-to-comprehend. Furthermore, I have found that the fact that Agent Salazar repeatedly (ten times in nine minutes) asked for consent to search is a factor that weighs on the side of coerciveness.

Subjective characteristics of this particular Defendant may also be relevant on the "voluntariness" question. These more subjective factors relate to the first prong, as to whether the consent was "unequivocal and specific and freely and intelligently given." In this case, the subjective factors the Court has been presented with are Defendant's knowledge of English, and his claimed fear of police, as primarily related to his cultural background.

Before embarking on this subjective analysis, I find it necessary to discuss my understanding of this area of confusing law in the Tenth Circuit.

In *United States v. Recalde*, 761 F.2d 1448, 1454 (10th Cir. 1985), *overruled in part on other grounds,* the Tenth Circuit noted that the defendant was a resident alien and that "[h]e gave undisputed testimony that his upbringing and experiences in Argentina had instilled in him an acquiescence to police authority. This factor is certainly relevant to the issue of coercion." *See also Schneckloth* 412 U.S. at 229("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of . . . the possibly vulnerable subjective state of the person who consents."); *United States v. Mendoza-Selgado*, 964 F.2d 993, 1011 n.9 (10th Cir. 1992)("Restated, the test is not whether a reasonable person would have felt coerced, but whether the consenting party felt coerced under the existing circumstances.").

Eight years later, in *United States v. Zapata*, 997 F.2d 751, 759 (10th Cir. 1993)(*citations omitted*), the Tenth Circuit held that "even assuming some subjective characteristics are relevant to the validity of [one's] consent, we reject the notion that [one's] attitude toward police, from whatever source, can constitute such a relevant subjective characteristic. While such attributes as the age, gender, education, and intelligence of the accused have been recognized as relevant, ... an intangible

9

characteristic such as attitude toward authority is inherently unverifiable and unquantifiable."[6]

It appears that the *Zapata* opinion stopped just a little short of overruling the *Recalde* opinion. In footnote 6, the *Zapata* panel indicated that while it would accord the attitude factor "no weight, one panel of this court cannot overrule another panel." In the same footnote, *Zapata* went on to note that "[W]e are quite confident, however, that *Recalde* does not require that the factor be given controlling or even significant weight." This notion was reiterated by the Tenth Circuit in *United States v. Sanchez-Valderuten*, 11 F.3d 985, 990 (10th Cir. 1993): "*Recalde*, however, does not require that defendant's attitude toward authority be given great weight in the totality analysis."[7]

I note that at least two district courts that have relied heavily upon subjective characteristics in concluding that consent was not voluntary, have been overturned by the Tenth Circuit. *See Zapata* (court's reliance primarily on defendant's background and attitude toward police, derived from his experiences while in his native Mexico, held to be clearly erroneous); *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993)(Tenth Circuit refused to give controlling or even significant weight to subjective characteristics, *i.e.*, two factors purportedly demonstrating vulnerability to coercion).

To summarize this case law, it appears that the Tenth Circuit heavily discourages giving substantial weight to the factor of a defendant's attitude toward authority, and presumably to any other factors that are not susceptible to verification and/or quantification. The Tenth Circuit has

---

[6] Referring to this statement found in *Zapata*, the Tenth Circuit subsequently noted that "[t]his is especially true where, as here, no testimony was presented regarding [the consenting person's] national background and unfamiliarity with the law from which one could infer that she felt coerced in consenting to the search." *United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993).

[7] In this same case, the Tenth Circuit noted the "tension" between what the *Zapata* panel stated in the text that it would have liked to do (*i.e.,* completely reject the notion that an attitude toward police is a relevant factor) and what it stated in footnote 6, indicating that "*Recalde* does not require that the factor be given controlling or even significant weight". *Id.* at n.5.

grudgingly allowed *some* weight to be given to these subjective factors however, particularly if testimony is presented regarding the consenting person's national background and unfamiliarity with the law from which one could infer that s/he felt coerced in consenting to the search. *See Iribe*, 11 F.3d at 1557. The *Recalde* Court also noted that the underlying evidence about defendant's upbringing and experiences in Argentina was undisputed. *Recalde*, 761 F.2d at 1454.

Based on this case law, I will evaluate the subjective factors before me in my totality analysis, taking care not to rely primarily or to give significant weight to these types of evidence.

### 1. Language issue[8]

Agent Salazar's questioning of Defendant was entirely in English. Clearly, Defendant's ability to understand this questioning is relevant to the issue of whether his consent was "unequivocal and specific and freely and intelligently given." Defendant argues that he did not consent to the search and that he could not truly consent, because he does not understand English. The evidence before the Court indicates that Defendant was born in Sudan and immigrated to Egypt at age 25. He remained in Egypt for approximately four years, then came to this country briefly. At that time he was not able to speak any English. Defendant has never studied English in school. Whatever English he understands, he has picked up while in New York, or in Canada, where he has lived since leaving America. Defendant is currently 31 years of age. Accordingly, at the time of Agent Salazar's

---

[8] The language factor is not as subjective, or difficult to verify or quantify, as the fear factor. In this instance, both parties offered considerable evidence on the topic of Defendant's ability (or lack thereof), insofar as understanding the English language is concerned. I have carefully considered Ms. Bonnette's testimony about Defendant's ability to communicate in English and do not find it credible. Conversely, I have considered the Defendant's proffered evidence from Mrrs. Nosar, Goodloe and Patten, and find them to be credible. These three witnesses had spent a greater amount of time with Defendant, more recently, and were all much more familiar with his ability to understand English. They were all consistent in their testimony that Defendant would be unable to understand English that is spoken to him quickly, in compound phrases or complicated sentences.

questioning, Defendant had lived in an English-speaking country for approximately two years. Defendant testified that he understands a little English, but that he cannot read or write. He elaborated that his ability to understand English is "poor" or "weak". He indicated that he is not required to speak English at his employment and that he is mostly limited to his community of people who spoke mostly Arabic. He stated that Agent Salazar's questions were "very fast".

He testified that he agreed to what Agent Salazar asked him, when he asked if he could search Defendant's bag, but that he did not really understand his question. He stated further: "I did not know or think that I had any other option other than to say yes. He was already with me in the room. And he already had the bag on his knees and said, 'Can I search it?' I had no other option. I told him, 'Go ahead.' "

Agent Salazar also testified, as follows, to his perception of Defendant's ability to understand his questioning: Defendant "most definitely" appeared to understand what he was saying to him; Defendant's responses were appropriate; Defendant corrected Agent Salazar if he misstated something; Defendant answered his questions immediately, which indicated to Agent Salazar that Defendant understood the English language; Defendant's nonverbal responses were appropriate.

During the questioning, Defendant indicated he had been in Africa, prompting Agent Salazar to ask whether Defendant was from Africa. Agent Salazar then stated that he could tell that Defendant had an accent and then said that he could see that Defendant understood English very well. Agent Salazar testified that Defendant nodded at that time. Agent Salazar testified that he felt very at ease that Defendant did understand him.

The Court resolves the dispute about Defendant's ability to understand English in favor of Defendant. I find Defendant credible and conclude that he had a marginal understanding of English,

which was eroded in this instance by the complexity of Agent Salazar's questions and the speed with which the questions were posed. I conclude that Defendant understood very little. This factor weighs against a finding of voluntary consent, because I conclude that Defendant's consent could not be specific or intelligently given, if he did not understand the questions posed to him.

### 2. *Testimony that Defendant had "No Option" But to Consent*

Defendant testified that he was scared and shaking when he saw Agent Salazar and realized he was a police officer; that this had to do with things he remembered about the police from Sudan and things he has heard and read about them.[9] He testified: "Anybody knows about the human rights abuses in Sudan, and the police take the law into their own hands." More specifically, he stated that he was afraid because of his experience there with police. He stated that he had been beaten and imprisoned by the police in Sudan.

He also testified he was fearful of police based upon what he had read and observed about police in America and in Canada. Defendant repeatedly testified that, based upon his fear, he felt he had no other option than to consent to the search or to give a statement, and that this was the only solution he was aware that he had. He reiterated that he was not told that he did not have to answer questions or consent to the search or that he could terminate the encounter and just go about his business. He testified that Agent Salazar's body language, facial expressions and manner of talking conveyed to him that he had no other option but to talk. He stated that he didn't know the law. "He is a policeman and he's asking me to search my bag and I did not know that I had any --- and I was

---

[9] Agent Salazar also testified that Defendant was shaking and that he appeared to have a very nervous manner. Obviously this nervousness could be caused if Defendant knew he was carrying contraband, as well as by his explanation of fear of authority figures.

13

very scared inside, and I knew that was the only option available to me." He stated that he would not have talked or said anything if he had felt he had had any other option.

As noted above, Defendant also testified: "I did not know or think that I had any other option other than to say yes. He was already with me in the room. And he already had the bag on his knees and said, 'Can I search it?' I had no other option. I told him, 'Go ahead.'"

I find Defendant's testimony on this topic credible.

In decreasing order of importance and weight, I will summarize the factors that I rely upon in my conclusion that consent was not voluntary in this case. First of all are the numerous factors[10] that I considered in concluding that the nature of the police conduct was coercive, resulting in an illegal detention.[11] These same factors are generally relevant under the *Mendez* case, to determine whether consent was voluntarily given.

My conclusions about these factors and my conclusion that there was coerciveness obviously weighs against a finding of voluntariness of consent, insofar as the inquiry as to whether or not the

---

[10] These factors include that the questioning occurred primarily in a roomette, in a confined space, outside of public view, and was primarily private in nature; that the entire time, Defendant was physically contained between the two agents; that the questions were excessively speedy, persistent and hard-to-comprehend; that Defendant was asked for his consent 10 times in approximately nine minutes; that Defendant was not advised of his right to refuse to answer the questions, or to leave the encounter; that Defendant was dressed only in underwear for a considerable portion of the questioning.

[11] The Supreme Court has provided three factors that are especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure: 1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975), *cited in United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994). In this case, there was no distance in time between the coercive conduct of the agents and the consent given by Defendant. There were no intervening circumstances. Finally, I have concluded that the police misconduct was coercive. Based on my analysis of these three factors, I conclude that, not only has the Government not shown that the consent was voluntary in fact, but it has not demonstrated a break in the causal connection between the illegality and the consent, such that this Court could be satisfied that the consent was "sufficiently an act of free will to purge the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 486 (1963). Consequently, the coerciveness of the illegal detention is a factor that I consider as material to the analysis of voluntariness.

consent was "given without implied or express duress or coercion."

Next I must consider whether the consent was "unequivocal and specific and freely and intelligently given". In this analysis, I considered Defendant's ability to understand English. As noted above, I conclude that Defendant has only a marginal understanding of English and that he was unable to understand Agent Salazar's questioning. Consent cannot be unequivocally, specifically or intelligently given by someone who does not understand (1) the language used in the questioning; and (2) his applicable legal rights to decline to give such consent.

As to whether the consent was freely given, I placed limited reliance on the most subjective factor of all, Defendant's stated fear of police. Obviously this is unverifiable and unquantifiable. However, I note that this is undisputed and there is evidence about Defendant's "national background and unfamiliarity with the law from which one could infer that [he] felt coerced in consenting to the search." *See Iribe*, 11 F.3d at 1557. As stated above, I found Defendant credible on this topic. I conclude that based upon his testimony relating to his experiences in Sudan with police and his lack of understanding that he had any options to decline to give consent, that I may properly rely on this stated fear of police as a factor in my analysis. I have not given great or substantial weight to this factor.

Based on the totality of all of these circumstance, I conclude that the Government has not provided clear and positive evidence that consent was unequivocal and specific and freely and intelligently given, and that it was given without implied or express duress or coercion. It has not been established to my satisfaction that the police did not coerce Defendant into granting consent.

**WHEREFORE**, for the reasons stated herein Defendant's Motion to Suppress Evidence and Statements (Docket No. 19) shall be **granted**.

**IT IS SO ORDERED.**

 _____
 **UNITED STATES DISTRICT JUDGE**